# FOR PUBLICATION



FILED
Dec 23 2013, 5:56 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS:

**WILLIAM W. DRUMMY**
**HOLLY A. REEDY**
Wilkinson Goeller Modesitt
Wilkinson & Drummy, LLP
Terre Haute, Indiana

**DOUGLAS V. JESSEN**
Statham Allega & Jessen, LLP
Evansville, Indiana

ATTORNEYS FOR APPELLEES:

**KAREN B. NEISWINGER**
Indianapolis, Indiana

**REED S. SCHMITT**
Rhine Ernest, LLP
Evansville, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MICHAEL W. PETERS, M.D. and DEACONESS HOSPITAL, INC., | ) ) ) | |
| Appellants-Defendants, | ) ) | |
| vs. | ) ) | No. 82A01-1302-PL-55 |
| CYNTHIA S. KENDALL and MICHAEL J. KENDALL, | ) ) ) ) | |
| Appellees-Plaintiffs. | ) ) | |

### APPEAL FROM THE VANDERBURGH CIRCUIT COURT
The Honorable Carl A. Heldt, Senior Judge
Cause No. 82C01-0803-PL-112

**December 23, 2013**

**OPINION - FOR PUBLICATION**

**RILEY, Judge**

STATEMENT OF THE CASE

Appellants-Defendants, Dr. Michael W. Peters (Dr. Peters) and Deaconess Hospital, Inc. (Deaconess Hospital) (collectively, the Medical Group), appeal the trial court's denial of their motion for partial summary judgment in the medical malpractice suit brought by Cynthia S. and Michael J. Kendall (the Kendalls).

We affirm.

ISSUES

The Medical Group raises four issues on appeal, and the Kendalls also raise four issues on cross-appeal.[1] We find one of the cross-appeal issues is dispositive and restate it as the following: Whether the Proof of Claim filed by the Kendalls in the liquidation proceedings of Dr. Peters' insurer constitutes a binding contract.

FACTS AND PROCEDURAL HISTORY

On October 5, 2001, Cynthia Kendall (Cynthia), who was then forty-three years old, was at a festival when she began experiencing disorientation, difficulty with speech, and pain and weakness on the left side of her body. Her husband, Michael Kendall (Michael), drove her to the emergency room at Deaconess Hospital in Evansville, where she was examined by Dr. Peters. Dr. Peters ordered tests and diagnosed Cynthia as having

---

[1]The Medical Group's issues, which we have restated, are as follows: (1) whether a release provision included in the Proof of Claim is ambiguous; (2) whether the parties' intent in executing the release is admissible; (3) whether the release is sufficient to discharge Dr. Peters' medical malpractice liability; and (4) whether the release discharges Deaconess Hospital's vicarious liability as Dr. Peters' employer. The Kendalls' remaining cross-appeal issues, as restated, are as follows: (1) whether the trial court correctly denied the Medical Group's two summary judgment motions based on genuine issues of material fact; (2) whether the release is ambiguous; and (3) whether Indiana or Pennsylvania law governs this case.

2

experienced a "transient ischemic attack." (Appellees' Br. p. 2). After treating Cynthia with four baby aspirin, Dr. Peters discharged her without a neurological or neurosurgical consultation and informed her that she should follow-up with her family physician. At the time of her discharge, Cynthia's symptoms had not subsided, and, once home from the hospital, they only worsened. Approximately one hour later, she called for an ambulance and returned to Deaconess Hospital. After performing an ultrasound, medical personnel administered heparin to treat the dissection of Cynthia's right carotid artery. Despite the heparin therapy, two days later, a C.T. scan depicted "a large fronto-parietal infarction on the right side of her brain"—in other words, Cynthia had suffered a stroke. (Appellants' App. p. 51). Cynthia received anti-coagulation therapy and rehabilitation, but the stroke resulted in "permanent residual dysfunction[,]" including paralysis and weakness in half of her body. (Appellees' Br. p. 2).

At the time of Cynthia's stroke, Dr. Peters had medical malpractice insurance through PHICO Insurance Company of Pennsylvania (PHICO). Dr. Peters' policy, which was in effect from January 3, 2001 through January 3, 2002, had a liability limit of $250,000 per occurrence and an aggregate limit of $750,000. Four months after Cynthia's stroke, on February 1, 2002, the Commonwealth Court of Pennsylvania declared PHICO insolvent and appointed a Liquidator to commence liquidating the company. Thirty days later, all liability policies issued by PHICO were cancelled, at which point PHICO "ceased to pay for the costs of defense and for indemnification of settlements made or judgments entered in lawsuits against the insureds under those policies, instead providing a means for

3

recovery from the assets of PHICO . . . on claims within the coverage of those policies" by filing a Proof of Claim in the Liquidation. (Appellants' App. p. 163).

On February 24, 2003, the Kendalls filed a proposed complaint with the Indiana Department of Insurance (Department) in accordance with the Indiana Medical Malpractice Act (Act). In their proposed complaint, the Kendalls alleged that the Medical Group's negligence had resulted in Cynthia's permanent disabilities. Subsequent to filing their proposed complaint, the Kendalls received a blank Proof of Claim form from the PHICO Liquidator. On February 9, 2004, Cynthia completed and signed the Proof of Claim form, omitting the amount of her claim and attaching a copy of the proposed complaint filed with the Department. Immediately prior to the signature line, the Proof of Claim contained a provision stating, in part, that "the undersigned hereby <u>releases any and all claims</u> which have been or could be made against such PHICO insured . . . subject to coverage being accepted by the Liquidator." (Appellants' App. p. 42). On March 8, 2004, the Kendalls filed the Proof of Claim. Nearly five years after filing the proposed complaint, on December 19, 2007, the Department issued an opinion rendered by the Medical Review Panel, which determined that "[t]he evidence does not support the conclusion that [the Medical Group] failed to meet the applicable standard of care as charged in the complaint." (Appellants' App. pp. 67-69).

On March 10, 2008, the Kendalls filed their Complaint with the trial court, alleging the Medical Group was negligent based on the failure to promptly diagnose and appropriately treat Cynthia. The Kendalls seek compensation for Cynthia's physical and emotional pain and suffering, permanent physical disability, impairment to earning

4

capacity, and substantial medical expenses, as well as for Michael's loss of "services, society, companionship, consortium and other benefits of his marital relationship." (Appellants' App. p. 28).

As evidence refuting the conclusion of the Medical Review Panel, the Kendalls filed an affidavit of Dr. David L. Gregory (Dr. Gregory), a physician board-certified in Emergency Medicine. Dr. Gregory stated that he had reviewed Cynthia's medical and rehabilitation records and opined that the Medical Group had "deviated from the standard of care." (Appellants' App. p. 51). Specifically, Dr. Gregory concluded that Dr. Peters had "failed to initially diagnose and treat [Cynthia's] impending stroke or arrange for [a] specialty consultation[,]" and discharging her with ongoing symptoms "was below the applicable standard of care and contributed to the delay in diagnosis." (Appellants' App. pp. 51-52). Furthermore, Dr. Gregory noted that "[i]f the nurses had properly assessed [Cynthia] and documented their assessments, [she] may have received a more timely referral to a neurologist for proper testing, diagnosis, and treatment." (Appellants' App. p. 51). On July 29, 2009, the Kendalls executed a second, "identical set o[f] Proof of Claim forms" they received from the Liquidator, this time specifying a claim in the amount of $250,000. (Appellees' Br. p. 3).

On December 3, 2010, the Medical Group filed its first motion for partial summary judgment with the trial court, claiming the Kendalls released their claim against Dr. Peters in the full amount of his "maximum liability of $250,000.00 under [the Act]." (Appellants' App. p. 34). On December 21, 2010, the Liquidator provided the Kendalls with a Notice of Claim Evaluation (NOCE), which valued their claim at $0.00. PHICO's claims analyst

5

stated that, in arriving at this valuation, he had examined the evidence as a whole for "any breach of the applicable standard of care for emergency medicine physicians" and had concluded that the Kendalls did not establish "a violation of the standard of care and causation in particular." (Appellants' App. p. 163). On January 12, 2011, the Kendalls filed an objection to the NOCE, and, on November 23, 2011, the Liquidator issued a revised NOCE, which valued the Kendalls' claim at $250,000 based on PHICO's policy limit. On December 4, 2011, the Kendalls executed the revised NOCE per its directive: "If you ACCEPT the NOCE, sign and return one copy." (Appellants' App. p. 182). Shortly thereafter, PHICO made an interim payment to the Kendalls for 30% of the revised value of their claim—that is, $75,000.

On December 13, 2011, the trial court entered partial summary judgment for the Medical Group, concluding that Dr. Peters and Deaconess Hospital "are qualified health care providers under the [Act] with respect to [the Kendalls'] claims in this case." (Appellants' App. p. 149). As to the issue of whether the Kendalls had released their claim against Dr. Peters, however, the trial court denied the Medical Group's summary judgment motion, finding a genuine issue of material fact. Four months later, on April 30, 2012, the Medical Group filed a Renewed Motion for Partial Summary Judgment "based on new evidence that the Liquidator accepted coverage of [the Kendalls'] claim filed in the PHICO Liquidation proceeding." (Appellants' App. p. 150). On July 31, 2012, the trial court heard arguments on the renewed summary judgment motion. On November 20, 2012, the trial court denied the Medical Group's renewed motion based, again, on its finding "that genuine issues of material fact still exist as to whether [the Kendalls] released their claim

6

against Dr. [Peters]" by filing a Proof of Claim in PHICO's liquidation (Appellants' App. p. 24).

On December 12, 2012, the Medical Group filed a motion to certify an interlocutory order for immediate appeal, which the trial court granted on January 2, 2013, and, on March 12, 2013, we accepted jurisdiction. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

Finding one issue is dispositive of this summary judgment appeal, we address the Kendalls' claim on cross-appeal that the Proof of Claim, which includes a release of liability provision, lacks the essential elements to render it a binding contract.

I. *Standard of Review*

In reviewing a trial court's ruling on a motion for summary judgment, we apply the same standard used by the trial court. *Manley v. Sherer*, 992 N.E.2d 670, 673 (Ind. 2013). Summary judgment is appropriate when the designated evidentiary material establishes there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* If the moving party makes a *prima facie* showing that there are no factual disputes and that he is legally entitled to judgment, the burden shifts to the non-moving party to set forth specific evidence that demonstrates there is a genuine issue of material fact. *Perry v. Driehorst*, 808 N.E.2d 765, 768 (Ind. Ct. App. 2004), *reh'g denied, trans. denied*. Our court will construe all facts and inferences in favor of the non-moving party and will resolve all doubts concerning the existence of an issue of material fact against the moving party. *Manley*, 992 N.E.2d at 673. In determining whether summary

7

judgment is appropriate, we may rely upon any theory supported by the evidence. *Thomas v. Deitsch*, 743 N.E.2d 1218, 1219 (Ind. Ct. App. 2001).

## II. *Release of Liability*

We first note that the parties agree that the standard rules of contract law apply to documents purporting to release the liability of others. *See Depew v. Burkle*, 786 N.E.2d 1144, 1147 (Ind. Ct. App. 2003), *reh'g denied, trans. denied*. The existence of a contract is a question of law. *Conwell v. Gray Loon Outdoor Mktg. Grp., Inc.*, 906 N.E.2d 805, 813 (Ind. 2009). Formation of a contract requires an offer and acceptance, consideration, and a meeting of the minds of the contracting parties. *Id.* at 812-13. In order for a contract to be valid and enforceable, the parties must intend to be bound, and the essential terms must be reasonably definite and certain. *Sands v. Helen HCI, LLC*, 945 N.E.2d 176, 180 (Ind. Ct. App. 2011), *trans. denied*. It is well-settled that, in order to be valid, a release must be supported by consideration. *Bogigian v. Bogigian*, 551 N.E.2d 1149, 1151 (Ind. Ct. App. 1990), *reh'g denied*.

In this case, the Kendalls filed two separate Proofs of Claim in PHICO's liquidation. Pursuant to Pennsylvania law, each contained the same release of liability provision:

> If the foregoing Proof of Claim alleges a claim against a PHICO insured (third party claim), the undersigned hereby releases any and all claims which have been or could be made against such PHICO insured based on or arising out of the facts supporting the above Proof of Claim up to the amount of the applicable policy limits and subject to coverage being accepted by the Liquidator, regardless of whether any compensation is actually paid to the undersigned.

(Appellants' App. pp. 42, 64). The Kendalls contend that they did not "give a full and binding release" by signing the Proof of Claim because the Proof of Claim "in no manner

8

constitutes a binding contract, as there is no offer, no acceptance, no consideration and no meeting of the minds." (Appellees' Br. pp. 10-11). The Kendalls argue that the document is not labeled as a contract or release, does not identify "the name of any party allegedly being released," and does not "purport to offer any specific amount to [the Kendalls] to settle their claim." (Appellees' Br. p. 10). Instead, the Kendalls note that the Liquidator sent them a blank form, requesting that they fill in the circumstances giving rise to their claim and provide an "amount of claim." (Appellees' Br. p. 10). The Medical Group responds that the Proof of Claim satisfies the criteria of a contract because "there was valid consideration" as "the Kendalls were permitted to make a claim for damages in the liquidation proceeding." (Appellants' Reply Br. p. 3).

While the Medical Group is correct that monetary consideration is not required, there is no reasonably definite language in the release compelling PHICO to accept coverage, consider the merits of the Kendalls' claim, or pay one cent of compensation. "[I]t is fundamental that a contract is unenforceable if it fails to obligate the parties to do anything.'" *Licocci v. Cardinal Assocs.,* 445 N.E.2d 556, 559 (Ind. 1983). The Medical Group relies on a recent decision of this court in which we stated that "[a]ny consideration which will sustain a promise to pay will suffice" and argues that, "[w]ithout making such a claim, [the Kendalls] would have not been entitled to recover any funds from the liquidation." *Lily, Inc. v. Silco, LLC*, No. 82A05-1209-PL-459, 2013 WL 5276028, at *9 (Ind. Ct. App. Sept. 19, 2013); (Appellants' Reply Br. p. 3). In *Ritenour v. Mathews*, 42 Ind. 7, 14 (Ind. 1873), our supreme court established that a promise to do what one "is already bound to do by law or by contract" is insufficient consideration. In the present

9

case, PHICO's legal and contractual obligation to pay the malpractice damages preceded the Kendalls' execution of the Proof of Claim.

First, PHICO's duties are governed by the Act. Ind. Code art. 34-18. Dr. Peters and Deaconess Hospital are qualified health care providers under the Act and are, thus, not liable in a malpractice action for any amount in excess of $250,000. I.C. §§ 34-18-2-14(1); 34-18-3-2; 34-18-14-3(b). If it is established that a physician's malpractice has caused damages greater than $250,000, any overage is paid from the Patient's Compensation Fund (Fund). I.C. § 34-18-14-3(c). The Fund caps the total amount recoverable per injury at $1,250,000. I.C. § 34-18-14-3(a)(3). Pursuant to the Act, Dr. Peters filed proof of his insurance coverage through PHICO with the Department and paid the required surcharge amount. *See* I.C. §§ 34-18-3-2, 34-18-5-1, 34-18-13-2. Dr. Peters' policy with PHICO was in force at the time of the alleged malpractice involving Cynthia; as such, Dr. Peters *and* PHICO might be liable to Cynthia to the extent and manner specified in the Act.[2] I.C. § 34-18-13-1. By virtue of Dr. Peters' status as a qualified health care provider, the law presumes that his PHICO-issued policy includes a provision obligating PHICO "to pay an award imposed against its insured under [the Act]." I.C. § 34-18-13-4.

Second, PHICO's duties are governed by its insurance policy with Dr. Peters. In *Indiana Insurance Guaranty Association v. Bedford Regional Medical Center*, 863 N.E.2d 308 (Ind. 2007), which arose from the same PHICO insolvency, our supreme court

---

[2] Deaconess Hospital also filed proof of financial responsibility with the Department, listing its malpractice carrier as ProAssurance Indemnity Company, Inc. In the parties' designated materials, however, there is evidence that Deaconess Hospital may also be considered a "policyholder" of PHICO because it obtained the liability policies for its physicians under the pseudonym Physician Services of Deaconess Hospital.

10

analyzed the payment of lost wages under the Indiana Insurance Guaranty Association (IIGA) Law of 1971, which requires the IIGA to pay for the claims that would have been covered under the policy of a now-insolvent insurer. *Id.* at 309-10 (citing I.C. § 27-6-8-7). In *Indiana Insurance Guaranty Association*, a hospital settled its malpractice liability with the patient's estate, and the court held that the IIGA was obligated to reimburse the hospital because its insurance policy would have required PHICO to pay the full amount of the claim had PHICO not been insolvent. *Id.* at 309-11, 314. Based on the supreme court's holding, the Kendalls are entitled to compensation for Dr. Peters' malpractice, if established, notwithstanding PHICO's insolvency, and if PHICO fails to uphold the obligations of its policy, Dr. Peters must pay the first $250,000 of the Kendalls' damages and then pursue recovery of those costs from the IIGA.

Accordingly, PHICO has a legal and contractual duty to pay its policy limit for any damages determined to be the result of Dr. Peters' malpractice. It is, therefore, insufficient as consideration for the release of all liability that the Kendalls were permitted to file a Proof of Claim that obligated PHICO to do no more than it was already bound to do. Even were we to accept the Medical Group's contention that it is sufficient consideration that, by filing the Proof of Claim, the Kendalls could potentially receive a payment without first having to prove the merits of their claim to a jury, we find nothing in the Proof of Claim demonstrating that the parties bargained for their respective benefits and detriments. *Bogigian*, 551 N.E.2d at 1151.

> The mere presence of some incident to a contract which might, under certain circumstances, be upheld as a consideration for a promise, does not necessarily make it the consideration for the promise in that contract. To

11

give it that effect, it must have been offered by one party, and accepted by the other, as one element of the contract.

*Id.* (quoting *Fire Ins. Assoc., Ltd. v. Wickham*, 141 U.S. 564, 579 (1891)). Because we conclude, as a matter of law, that the release is not a binding contract for lack of consideration, we need not address the remaining elements of contract formation or the parties' arguments concerning their intent in signing the release, the ambiguity of the release, and the conflict of Pennsylvania and Indiana laws regarding the validity and effect of the release.

## CONCLUSION

Based on the foregoing, we conclude that the trial court appropriately denied the Medical Group's partial summary judgment motion because the Kendalls did not release the Medical Group from liability by filing a Proof of Claim in the PHICO liquidation.

Affirmed.

MAY, J. and VAIDIK, J. concur